**CLOSED**

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DANIEL J. KING, AMADEO L. DI SARRO, RICHARD SULLIVAN, et al., | : | **Civil Action No. 04-5125 (SRC)** |
| | : | |
| Plaintiffs, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| GNC FRANCHISING, INC., GENERAL NUTRITION DISTRIBUTION CO., et al., | : | |
| | : | |
| Defendants. | : | |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court upon the Motion for Summary Judgment filed by

Defendants GNC Franchising, Inc. ("GNC") and General Nutrition Distribution Co. ("GND")

(collectively, "Defendants") (docket item # 51) and upon Defendants' Motion To Strike

Plaintiffs' Jury Demand (docket item # 53).   This Court has considered the submissions by the

parties in connection with these motions, and pursuant to Federal Rule of Civil Procedure 78,

adjudicates the motions based on the papers submitted.  For the reasons discussed below, this

Court grants Defendants' motion for summary judgment in its entirety and dismisses Defendants'

motion to strike the jury demand as moot.

### I.    FACTUAL BACKGROUND

This action involves various claims arising out of the franchising relationship between

Plaintiffs and GNC.  With the exception of named Plaintiff GNC Franchisee Association, Inc.,

Plaintiffs are current and former franchisees who entered into Franchise Agreements to operate

GNC stores in New Jersey. (Final Pretrial Order, Stip. of Facts, ¶ 1.) (Because the Franchise Agreements are identical in all material respects with regard to the provisions at issue in this motion for summary judgment, the Court will hereinafter refer to a single GNC "Franchise Agreement.") Defendant GNC is a company engaged in the sale of, among other things, vitamin and mineral supplements, as well as various health food and nutrition products. (Id., ¶ 34.) GNC does business through both franchised retail stores and corporate-owned retail stores. (Id.)

The Franchise Agreement imposes a number of requirements and standards on franchisees, many of which are intended to ensure that the GNC retail stores are operated in a unified and consistent manner. It requires, among other things, that the franchisees conduct business "in accordance with Franchisor's [GNC's] Confidential Operations Manual, which is incorporated by reference into the Franchise Agreement. (Franchise Agreement, § IX.A.) The Operations Manual addresses matters central to Plaintiffs' allegations of misconduct by Defendants: the "ACE" system for assessing compliance with standards under the Franchise Agreement and Operations Manual, franchisees' purchase of products from third-party vendors, and the periodic enhancement of store appearance known as a "reset."

The "ACE" (or "Assessing the Customer Experience") Reporting system measures a store's compliance with merchandising presentation, dress code, customer service, and other operational issues. (Operations Manual at 3.33.) It is intended to ensure consistency and a certain level of quality among stores. (Id.) GNC provides the ACE reporter, employed by an independent third-party service hired by GNC, with a list of items on which to grade the store during an inspection. (Id.; Aff. of Elizabeth Kitchen ("Kitchen Aff."), ¶¶ 3-4.) While a franchisee must obtain a minimal score to pass the assessment, GNC gives franchisees who fail

additional opportunities to pass the assessment. (Kitchen Aff., ¶¶ 5-6.) None of Plaintiffs'

Franchise Agreements were terminated for failure to comply with ACE Reports. (Defs.' St. of

Material Facts, ¶ 81 (citing deposition testimony).)

     In addition to requiring franchisees to sell GNC products, the Operations Manual permits

franchisees to purchase products from outside vendors, also known as direct purchase ("DP")

vendors. (Operations Manual at 3.9.) All DP vendors and DP products must be approved by

GNC before the DP products may be sold in GNC retail stores. (Id. at 3.9, 7.37; Franchise

Agreement § VI.H.) GNC reserves the right to revoke approval of DP products at any time and

to require the DP vendors to comply with GNC's operational procedures and standards of

performance. (Operations Manual at 11.9; Franchise Agreement § VI.H.) Moreover, the

Operations Manual states that GNC is not obligated to approve a DP product, even if it satisfies

GNC's approval criteria. (Operations Manual at 11.9.)

     Product placement within stores, including the location for DP products, is dictated by

GNC through its "Plan-O-Gram." (Operations Manual at 7.37, 8.1.) The Plan-O-Gram is a

merchandising system designed to guarantee consistency from store to store. (Id. at 8.1) DP

products, in particular, will not be uniform from store to store, and thus to maintain uniformity of

appearance among GNC retail locations, GNC sets required products in prominent places in the

store and allots less prominent space for DP items. (Id. at 7.37.)

     The Operations Manual also notifies franchisees that GNC will periodically require the

retail stores to be "reset," which generally involves enhancements and updates such as signage,

fixtures and overall "freshening" of the store's appearance. (Operations Manual at 8.1.) The

reset is GNC's company-wide implementation of the Plan-O-Gram. (Id. at 8.11) Franchisees are

required to participate in the resets.  (Id.)  In that regard, the Franchise Agreement states that

"Franchisee shall make such additions, alterations, repairs, and replacements thereto . . . as may

be required for the purpose, including, without limitation, such periodic repainting, repairing, and

replacing of obsolete signs, fixtures, and furnishings as Franchisor may reasonably direct."

(Franchise Agreement, § VI.E.)  Resets occur annually.  (Kitchen Aff., ¶ 10.)  In contrast, more

thorough remodeling, referred to in the Operations Manual as a "refurbishment" will occur only

once every five years.  (Franchise Agreement § VI.F.)

The Franchise Agreement expressly grants GNC the right to modify the requirements and

standards to which franchisees will be held.  It states:

> The parties acknowledge and agree that the System may be
> supplemented, improved, and otherwise modified from time to
> time by Franchisor in response to the opportunity to offer new
> services and products to customers of stores operating under the
> System, the experience of Stores over time, and other factors.  The
> parties further acknowledge and agree that, in the interest of
> preserving the integrity of the System, Franchisor shall have full
> control and discretion over such developments and that Franchisee
> shall comply with all reasonable requirements of Franchisor in that
> regard.

(Id., § I.F.)

Plaintiffs filed this action on October 20, 2004.  While the original Complaint pled a

number of causes of action, the gravamen of Plaintiffs' grievance is that Defendants have

violated the New Jersey Franchise Practices Act's prohibition of "unreasonable standards of

performance" and breached the Franchise Agreement in their application of the ACE Reporting

system and enforcement and alteration of DP requirements.  By this motion for summary

judgment, Defendants seek a dismissal with prejudice of all remaining counts of Plaintiffs'

Second Amended Complaint. (Counts Four, Six, Eight and Nine have been withdrawn by Plaintiffs.) (<u>See</u> June 1, 2006 Order (docket item #44).)

## II.    MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on the entirety of Plaintiffs' Second Amended Complaint. The claims deal with breach of the New Jersey Franchise Practices Act ("NJFPA"), breach of the Franchise Agreement, conversion of reset fees, recovery of money obtained by GNC in settlement of a separate antitrust suit and punitive damages. Defendants also seek the dismissal of all claims as to named plaintiff "GNC Franchisee Association, Inc." based on lack of standing. The Court will address each of these matters in turn.

### A.    <u>Summary Judgment Standard of Review</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Kreschollek v. S. Stevedoring Co.</u>, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. <u>See</u> <u>Boyle v. Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and

of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48. Pursuant to Federal Rule of Civil Procedure 56(e), the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), cert. denied, 507 U.S. 912 (1993)).

### B.    Violation of New Jersey Franchise Practices Act

Plaintiffs' claims for violation of the NJFPA (Counts One and Three) are grounded in the allegation that Defendants' ACE Reporting System and DP policy are unreasonable. Plaintiffs' mere disagreement with the franchisor's standards and requirements does not, however, render them unreasonable. Summary judgment must be granted as to these claims because Plaintiffs have not come forward with any evidence that might allow a jury to find that Defendants imposed unreasonable standards of performance on Plaintiffs, in violation of the NJFPA.

Insofar as it is relevant to the instant motion, the NJFPA prohibits a franchisor from "impos[ing] unreasonable standards of performance upon a franchisee." N.J.S.A. 56:10-7(e). The statute does not define the term "unreasonable standard," but caselaw applying this provision provides some guidance:

On a motion for preliminary injunction, the court in Beilowitz v. General Motors Corp.

6

found that plaintiff franchisee was reasonably likely to succeed on his "unreasonable standard" claim because the franchisor's revised business strategy, which imposed a territorial limit on the franchisee's ability to conduct business, would have required the franchisee to lose $11 million, or 40%, of its sales. Beilowitz v. Gen. Motors Corp., 233 F.Supp.2d 631, 643-44 (D.N.J. 2002). The Beilowitz court held that "[i]t is clearly an 'unreasonable standard of performance' within the meaning of the NJFPA to require a franchisee to operate at a substantial financial loss while the franchisor attempts to implement a new and unproven marketing strategy." Id. at 644. This Court also notes that in Beilowitz, the franchisor failed to renew the plaintiff's franchise, giving rise to a claim under the NJFPA for termination without good cause. Id.

The franchise requirement challenged in Liberty Lincoln-Mercury Inc. v. Ford Motor Co. was a surcharge applied by the franchisor to the wholesale automobile prices it charged its franchisee dealers. Liberty Lincoln-Mercury Inc. v. Ford Motor Co., No. Civ. 02-4146 (WGB), 2006 WL 1098178, at *1 (D.N.J. Mar. 31, 2006). The surcharge was intended as cost recovery method for the franchisor's compliance with the NJFPA's requirement that the franchisor reimburse its franchisee for parts used in warranty repairs. Id. at *1. The court held that the fact that the surcharge violated the NJFPA (because it frustrated the purpose of the provision requiring warranty repair reimbursement) did not necessarily mean that it constituted an unreasonable standard of performance under the statute. Id. at *5. It reasoned that the surcharge did not constitute a penalty on the franchisee and, therefore, the court did "not believe that a reasonable jury could find that the surcharge constituted an unreasonable standard of performance." Id. at *5.

In <u>Dunkin' Donuts Inc. v. Dough Boy Mgmt. Inc.</u>, franchisees had asserted NJFPA claims for both wrongful termination and for imposing unreasonable standards of performance. <u>Dunkin' Donuts Inc. v. Dough Boy Mgmt. Inc.</u>, No. Civ. A. 02-243 (JLL), 2006 WL 20521 (D.N.J. Jan. 3, 2006). Both claims were predicated on the same alleged misconduct by the franchisor, that is, the franchisees contended that the franchisor's unreasonable requirements led to the franchisees' termination. <u>Id.</u> at *11. The court held that there was a question of fact as to whether the standards were unreasonable. <u>Id.</u> It reasoned: "Defendants provide a litany of examples as to how Plaintiffs set them up for failure so that the Franchise Agreements could be terminated. It is without doubt that if a franchisor manipulates the system causing a franchisee's breach so that a Franchise Agreement is terminated, the termination occurs without good cause in violation of the NJFPA, <u>N.J.S.A.</u> § 56:10-5." <u>Id.</u>; <u>see also</u> <u>Gelardi Corp. v. Miller Brewing Co.</u>, 502 F.Supp. 637, 652-53 (D.N.J. 1980) (holding that jury could find franchisor's standards unreasonable where franchisor had "made [franchisee] Gelardi's business life sufficiently miserable that Gelardi was forced to quit its distribution of Miller products in its primary area of responsibility"); <u>Central Jersey Freightliner, Inc. v. Freightliner Corp.</u>, 987 F.Supp. 289, 295-96 (D.N.J. 1997) (denying plaintiffs' application for a preliminary injunction, where plaintiffs alleged that franchisor had orchestrated franchisee's breaches of agreement but had failed to show likelihood of success on wrongful termination and unreasonable standards claims under NJFPA).

In contrast to these examples, Plaintiffs' case presents none of the arbitrariness, bad intent or economic ruin which appear to be the hallmarks of an "unreasonable standard of performance"

under the NJFPA.  Moreover, while Defendants point to the lack of evidence in the record to support Plaintiffs' allegations of unreasonableness, Plaintiffs fail to come forward with evidence that demonstrates that there is question of material fact as to whether the DP and ACE Reporting policies could be found to be "unreasonable standards" under the NJFPA.

Plaintiffs contend that the DP requirements and ACE Reporting system, through which GNC assesses and enforces its requirements concerning, among other things, store appearance and product placement, cause Plaintiffs to sustain economic loss.  They argue that requiring franchisees to purchase a certain amount of product from GNC and relegating what, according to Plaintiffs, are the more popular DP products to less-preferred store space has caused Plaintiff franchisees to experience decreased cash flow, which in turn impacts their ability to purchase products on which the franchisees can profit.  Plaintiffs further argue that they are forced to buy GNC products that do not sell as well as DP products, which results in reduced sales and in expired products that must be discarded.  The restrictions imposed by GNC on what Plaintiffs buy and where they must place it, Plaintiffs maintain, amount to statutorily unreasonable standards because they force the franchisee to take a loss so that GNC may profit from sales of their own corporate product.

Even viewed in the light most favorable to Plaintiffs, none of these assertions by Plaintiffs  constitutes evidence of an unreasonable standard in violation of the NJFPA.  First, plaintiffs fail to come forward with any evidence that demonstrates a nexus between the poor product sales of which they complain and GNC's policies.  Second, plaintiffs do not provide any facts or legal authority that support their argument that reduced cash flow renders the policies unreasonable.  Third, it appears to this Court that Plaintiffs are dissatisfied with sales

performance of the particular franchised stores they own, feel overly restricted by the franchise system under which they operate, and generally disagree with certain of the standards and requirements imposed under the Franchise Agreement and Operations Manual. These complaints, however earnest on the part of Plaintiffs, may not be remedied by the NJFPA or by a breach of contract theory of recovery. Notably, Plaintiffs do not allege that they are unable to comply with the requirements or that GNC has terminated their Franchise Agreements based on their performance under these allegedly "unreasonable" standards.

Moreover, although the Second Amended Complaint also alleges that Defendants' alteration of the DP requirements violates the NJFPA's prohibition on unreasonable standards, Plaintiffs present no evidence that would support this claim. To summarize Plaintiffs' theory, Plaintiffs contend that GNC unreasonably and arbitrarily altered its approval process for DP vendors, forcing the franchisees to buy products through GND at higher prices than they would have paid through direct third-party purchases and moreover, higher prices than GNC charged its company-owned stores. Again, this Court cannot discern how these complaints of GNC's manner of conducting business constitute an actionable unreasonable standard of performance. The Franchise Agreement clearly gives GNC control over the approval and the revocation of approval of DP vendors and products. In their brief in opposition to the motion for summary judgment, Plaintiffs argue that the deposition testimony of Plaintiff Richard Sullivan gives rise to a question of material fact as to "GNC's improper manipulation and interference with the DP approval process." (Pl. Br. at 8.) He testified that he learned from sales representatives for a product known as Stryvectin that "GNC was applying pressure to them to sell directly to the warehouse. And then all a sudden the price went to somewhere around $72, which was the same

10

price as the warehouse. We deal with literally hundreds of vendors, people don't raise prices $9 overnight on an item, it just doesn't happen." (Pl. Br. at 10.) The Court finds that this testimony does not give rise to an issue of material fact with regard to Plaintiffs' claims that they were subjected to unreasonable standards of performance by GNC. The most the Court can glean from this testimony is that Plaintiffs believe GNC improperly interfered with the franchisees' transaction of business with the DP vendors. Such a claim has not been pled in the Second Amended Complaint.

In short, this Court concludes that Plaintiffs have presented no evidence that would permit a factfinder to determine that Defendants have violated the NJFPA's prohibition on unreasonable standards of performance. Defendants are entitled to summary judgment on the claims of violation of the NJFPA.

### C.     **Breach of Contract**

The breach of contract claim in the Second Amended Complaint (Count Two) appears to be predicated on the same alleged misconduct by GNC as detailed above, namely the imposition of unreasonable standards of performance by virtue of the ACE Reporting system and the DP policies. Specifically, the Second Amended Complaint alleges that GNC has breached the Franchise Agreement by (1) "[i]mplementing new policies that destroy the Plaintiffs' ability to be profitable" and (2) "[i]mposing unreasonable and arbitrary requirements on Plaintiffs in violation of Section VI of the form franchise agreement." (Second Am. Compl., ¶ 93.)

Just as the record fails to support Plaintiffs' claims under the NJFPA, as discussed in Section II.B of this Opinion, it includes no evidence that would permit a reasonable factfinder to conclude that GNC has breached the Franchise Agreement. The Franchise Agreement clearly

provides that GNC may modify the requirements and policies of the franchise system from time to time and that "Franchisor shall have full control and discretion over such developments and that Franchisee shall comply with all reasonable requirements of Franchisor in that regard." (Franchise Agreement, § I.F.)  For the same reasons discussed by the Court in Section I.B, Plaintiffs' breach of contract claim must be dismissed for failure to present any evidence that creates a question as to whether GNC's standards of performance or requirements under the Franchise Agreement were unreasonable.

To the extent Plaintiffs' breach of contract claim is based on GNC's collection of excessive reset fees in 2002, the record does not present evidence that would give rise to a genuine issue of material fact.  Though Plaintiffs did not brief this issue, the Court gathers, based on its reading of the Second Amended Complaint in the light most favorable to Plaintiffs, that Plaintiffs maintain that the reset fees charged in 2002 were greater than they have been in other years and that, therefore, GNC imposed remodeling fees disguised as reset fees.  Because Section VI.F. of the Franchise Agreement is cited in the Second Amended Complaint's count for breach of contract, the Court presumes that Plaintiffs believe that this conduct violated the provision limiting "refurbishment" to once every five years.  The evidence presented to the Court in support of this claim is woefully deficient.  The Second Amended Complaint attaches two reset fee invoices purporting to demonstrate the excessive charges.  (Second Am. Compl., Ex. I.)  Those invoices, however, have no connection to any GNC franchisee involved in this lawsuit. (One invoice pertains to "Vincent & Susan Signoriello for a GNC located in Manalapan, New Jersey and the other pertains to "Eric Miller" for a GNC located in Philadelphia, Pennsylvania.) As for the allegation that GNC has admitted that the 2002 fees were actually for refurbishment

(Second Am. Compl, ¶ 49), Plaintiffs attach to the Second Amended Complaint an incomplete copy of a March 10, 2003 article from the website for the Pittsburgh Post-Gazette that states "[Royal Numico CEO] Bennink was inclined to see progress at GNC, citing improved margins and the remodeling of almost all of the chain's 5,600 stores."  (Id., Ex. J.)  These items do not raise a genuine issue of material fact on the breach of contract claim.

The Court notes that it has taken a very generous reading of the pleadings and the submissions on the motion for summary judgment in analyzing the breach of contract claim. Plaintiffs' brief in opposition to the motion for summary judgment fails to address Defendants' arguments with respect to the breach of contract claim.   Plaintiffs have not indicated, nor can the Court discern, any conduct by GNC that would support their contract theory of recovery.  Indeed, without any briefing by Plaintiffs on the issue, the Court has not even been made aware of which contractual provisions Plaintiffs believe have been violated.  With respect to the breach of contract claim, Plaintiffs' opposition to the motion for summary judgment falls far short of Rule 56(e)'s requirement that they "set forth specific facts showing that there is a genuine issue for trial."

Accordingly, Defendants are entitled to summary judgment on Count Two of the Second Amended Complaint for breach of contract.

### D.     Breach of Implied Covenant of Good Faith and Fair Dealing

This Court also grants summary judgment in Defendants' favor on the claim for breach of the implied covenant of good faith and fair dealing (Count Seven).

Plaintiffs allege that Defenants' "unreasonable changes to the system" destroyed their rights to receive benefits under the contract and thus demonstrate that Defendants have breached

the covenant of good faith and fair dealing.  In other words, Plaintiffs argue that the changes have unfairly forced them to "either disobey Defendants requirements and policies, or lose cash flow, customers and/or their customers' goodwill."  (Pl. Br. at 13.)  Plaintiffs, however, point to no evidence of any malice or bad motive on the part of Defendants, a deficiency which is fatal to their claim.  The Supreme Court of New Jersey has clearly held that bad motive is "essential" to a claim for breach of the implied covenant of good faith and fair dealing.

> [A]n allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive.  *Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.  Bad motive or intention is essential*, for, as stated by the United States Court of Appeals for the Seventh Circuit, "[c]ontract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper."

Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001) (citations omitted) (quotations in original) (emphasis added).  Where a contract affords one party discretion in its performance under the contract, the party may be found to breach the duty of good faith and fair dealing if it "exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract."  Id.

Plaintiffs attempt to preserve their breach of the covenant of good faith and fair dealing by repeating, verbatim, allegations made in the Second Amended Complaint.  (Pl. Br. at 13-19.)  They do not, however, point to any evidence demonstrating that Defendants possessed the requisite bad motive or that they exercised their discretion under the Franchise Agreement in an arbitrary and capricious manner.   "Rule 56(e) itself provides that a party opposing a properly

supported motion for summary judgment may not rest upon [the] mere allegation[s] or denials of

his pleading, but must set forth specific facts showing that there is a genuine issue for trial."

Anderson, 477 U.S. at 256.

As Plaintiffs have failed to carry their burden under Rule 56(e), summary judgment on

the claim for breach of the implied covenant of good faith and fair dealing will be granted.

### E.    Conversion of Reset Fees

The gravamen of Plaintiffs' "conversion" claim (Count Five) is that Defendants charged

an excessive reset fee in 2002 and that they extracted this fee not for reset purposes, but to

remodel stores, in violation of the refurbishment provision of the Franchise Agreement.  Their

conversion claim fails as a matter of law because no evidence indicates, nor do Plaintiffs even

allege, that Defendants took something - a chattel or res - belonging to Plaintiffs without their

permission.

The essence of a conversion claim is that one party exercises the right of ownership over

property belonging to another without that person's permission.  "[T]he tort of conversion

consists of the wrongful exercise of dominion and control over property owned by another in a

manner inconsistent with the owner's rights."  Com'l Ins. Co. of Newark v. Apgar, 111 N.J.

Super. 108, 114 (Law Div. 1970).   Reviewing New Jersey law, this Court has articulated the test

for a conversion claim as follows: "A claim for conversion is established if a party proves that

the alleged offender assumed and exercised the right of ownership *over the party's goods or*

*chattels* without permission, and excluded the owner from exercising dominion over them."

Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 275 F.Supp.2d 543, 576 (D.N.J.

2003) (citing Barco Auto Leasing Corp. v. Holt, 228 N.J. Super. 77, 83 (App. Div. 1988)

(emphasis added).

This theory does not apply to remedy an alleged overcharge. In other words, the allegedly excessive amount of money Plaintiffs remitted to GNC for the 2002 reset cannot be considered property over which GNC improperly took control. Otherwise, a tort claim for conversion would lie any time a franchisor collected fees that the franchisee believed were excessive under the terms of their franchise agreement. Such a grievance does not, in this Court's opinion, sound in tort law.

As Plaintiffs cannot prevail on their conversion claim as a matter of law, summary judgment will be granted in Defendants' favor.

### F.    Accounting For Proceeds of Settlement of Antitrust Litigation

In Count Ten of the Second Amended Complaint, Plaintiffs allege an entitlement to certain proceeds recovered by GNC in settlement of price fixing claims that GNC asserted against several vitamin manufacturers in a separate and unrelated lawsuit. Plaintiffs assert they, too, were injured by the price fixing because, according to Plaintiffs, these higher fixed prices were passed on to them in GNC's sale of the vitamins to the franchisees. They argue that they are entitled to share in the settlement proceeds as "mandatory cost-plus purchasers" of GNC branded products.

Only one who purchased directly from an alleged price fixer may recover under federal antitrust laws. Illinois Brick Co. v. Illinois, 431 U.S. 720, 728-29 (1977); Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 930 (3d Cir. 1986). Others in the chain of manufacture or distribution are not considered injured parties and thus lack standing to bring an antitrust claim against the alleged price fixer. Illinois Brick Co., 431 U.S. at 729; Link, 788 F.2d at 930-31.

Notably, Plaintiffs do not dispute that they did not purchase product directly from the vitamin manufacturers.  (Pl Br. at 23-25.)  Instead, Plaintiffs seek to avail themselves of the narrow exception to the Illinois Brick rule for indirect purchasers that purchase from the direct purchaser under a "pre-existing cost-plus contract."  Illinois Brick Co., 431 U.S. at 736; Hanover Shoe v. United Shoe, 392 U.S. 481, 494 (1968).  The exception applies where the customer of the direct purchaser is "committed to buying a fixed quantity regardless of price."  Illinois Brick Co., 431 U.S. at 736.  In that situation, the indirect purchaser has standing to bring an antitrust suit against the alleged price-fixer.  Id.

Plaintiffs' claim fails as a matter of law because it no fair-minded jury could find that that the "cost-plus" exception applies to this case.  The fact that the Franchise Agreement requires franchisees to purchase a minimal amount of GNC-brand product does not transform it into a cost-plus contract.  "Under a cost-plus contract a product is sold at a specified markup above the seller's own cost."  Mid-West Paper Products Co v. Continental Group, Inc., 596 F.2d 573, 577 n. 9 (3d Cir. 1979).  The Franchise Agreement does not dictate that the price at which the mandatory GNC items will be sold to franchisees is some specified markup above GNC's cost or the goods.  Plaintiffs would have no standing to prosecute price-fixing claims against the vitamin manufacturers that supplied GNC with products and thus cannot, as a matter of law, prevail on their claim to recover a share of the settlement proceeds obtained by GNC in the antitrust litigation.

As for Plaintiffs' assertion that GNC "made verbal representations to Plaintiffs at NAC (National Advisory Counsel) meetings that the franchisees would receive their share of settlement proceeds," (Pl. Br. at 25) this Court rejects that argument as unsupported by any

evidence. Though Plaintiffs cite to the Affidavit of Scott Tull, the affidavit does not state that GNC made such a represenation. Moreover, the Second Amended Complaint does not even make this allegation or plead for relief for this purportedly broken promise. In short, there is no legal theory supported by evidence that would allow Plaintiffs to prevail at trial on this claim for recovery of antitrust litigation settlement monies.

Thus, Defendants are entitled to summary judgment on Count Ten of the Second Amended Complaint.

### G.    Standing of GNC Franchisee Association, Inc.

One of the named Plaintiffs in this action is the "GNC Franchisee Association, Inc." ("Franchisee Association"). According to Scott Tull, who was deposed on behalf of the Franchisee Association, the Franchisee Association was formed to pool together resources for the benefit of franchisees and, in part, to further the franchisees' interests in the matters at issue in this litigation. (Tull Dep. 22:1-8, Apr. 20, 2006.) The organization's members include current and past GNC franchisees. (Id., 8:11-16.) Defendants move that all claims brought by the Franchisee Association be dismissed for lack of standing. The motion will be granted.

"Standing is a threshold jurisdictional requirement." Interfaith Cmty. Org. v. Honeywell, Int'l, Inc., 399 F.3d 248, 258 (3d Cir.) (quoting Public Interest Research Group of N.J. v. Magnesium Elektron, 123 F.3d 111, 117 (3d Cir. 1997)), cert. denied, 125 S.Ct. 2951 (2005). To satisfy the standing requirements of Article III of the Constitution, "a plaintiff must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action." Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir.), cert. denied, 537 U.S. 881 (2002). An association may assert direct

standing for injuries it has sustained itself, or, in the absence of direct injury, may assert associational standing to pursue claims on behalf of its members.  Id.  To claim associational standing, an organization must satisfy the following three elements: (1) its members would have had standing to bring the action in their own right; (2) the interests at stake in the litigation are germane to the purpose of the association; and (3) neither the claims asserted nor the relief requested require the participation of the association's individual members.  Interfaith Cmty. Org., 399 F.3d at 258.

    The Franchisee Association has neither direct nor associational standing to pursue this action.  The Franchisee Association has not directly sustained any of the complained-of injuries. The Franchisee Association admits that it does not own a GNC franchise.  (Tull Dep. 14:20-24, Apr. 20, 2006.)  Nor can it demonstrate that each and every one of its members has standing to bring the claims alleged in the Second Amended Complaint.   Mr. Tull testified that not all members of the Franchisee Association are current GNC franchisees.  (Id., 8:13-16.)  Some "inactive" members have closed their stores.  (Id., 8:16-19.)  In fact, Mr. Tull conceded that the Franchise Association cannot demonstrate that each member of the Franchisee Association has standing to bring the claims pled.  (Id., 22:9-20.)

    For these reasons, the Court concludes that the Franchisee Association does not have standing with regard to any of the claims brought in this action, and thus this Court lacks jurisdiction over any and all claims insofar as they are pled by Plaintiff Franchise Association. The Franchisee Association's claims will be dismissed with prejudice.

**H.    Defendants Apollo Management, LLP and Royal Numico, N.V.**

Apollo Management, LLP ("Apollo") and Royal Numico, N.V. ("Royal") are both named as Defendants in this action.  Plaintiffs have stipulated, however, that Apollo and Royal are not proper parties to this action.  (Final Pretrial Order, Stip. of Facts ¶¶ 31-32.)  Defendants have moved for the dismissal of all claims against these parties, and Plaintiffs have not opposed this portion of Defendants' motion.

Accordingly, all claims against Apollo and Royal will be dismissed with prejudice.

**I.    Punitive Damages Claim**

Count Eleven of the Second Amended Complaint pleads for the Court to award punitive damages under New Jersey law.   Punitive damages are intended to "to punish aggravated misconduct by the defendant and to deter him and others from repeating it."  Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984).  It follows that, without a valid cause of action for the underlying misconduct, Plaintiffs may not prevail as a matter of law on their punitive damages claim.  Id. at 45.  This claim will also be dismissed.

**III.    MOTION TO STRIKE JURY DEMAND**

In accordance with the foregoing discussion, summary judgment on all counts of the Second Amended Complaint will be granted in Defendants' favor.  The disposition of the summary judgment motion renders Defendants' motion to strike Plaintiffs' jury demand moot.

**CLOSED**

**III.    CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment, dismissing with prejudice Plaintiffs' Second Amended Complaint in its entirety.  An appropriate form of order will be filed together with this Opinion.

                                                          s/ Stanley R. Chesler
_____   STANLEY R. CHESLER
                                                        United States District Judge

DATED: October 23, 2006